

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

RICHARD WALTMAN, )
)
Plaintiff, )
)
vs. )               Case No. 09-CV-280-F
)
GEORGIA-PACIFIC, LLC, )
)
Defendant. )

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING MOTION TO STRIKE

This matter comes before the Court on several motions filed by Defendant Georgia-Pacific (G-P). The first is a *Motion for Summary Judgment*, Doc. No. 65. Second is a *Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages*, Doc. No. 73. Third is a *Motion to Strike Affidavit of Manual Ypsilantes*, Doc. No. 86. For the reasons set forth in further detail below, the Court will grant in part and deny in part the summary judgment motion, deny the motion for partial summary judgment on punitive damages as applied to the remaining claim, and deny as moot the motion to strike Mr. Ypsilantes's affidavit.

## *BACKGROUND*

The basic facts of this case are largely undisputed—it is the characterization of those facts that is the subject of the current dispute of the parties.

G-P entered into a contract with Diversified Transfer and Storage, a broker of shipping services, as a private contractor to ship wallboard from its manufacturing facility in Lovell, Big Horn County, Wyoming. Diversified then hired R. Waltman Trucking as a private contractor. R. Waltman Trucking was owned by Robert Waltman. R. Waltman Trucking, in turn, hired Richard Waltman, Robert Waltman's father, to haul the particular load of wallboard that plays a part in this particular incident.[1]

Mr. Waltman arrived at the facility at around 9:30 a.m. on May 5, 2006. He checked in, then waited to be loaded. It is not clear how long he had to wait, although it does not appear that it was a significant time. When his turn came, he backed his flatbed trailer into one of three loading docks of the facility, and a forklift operator loaded the wallboard onto the trailer. Mr. Waltman loosely tied down the load, then drove his truck a short distance to a dirt lot on G-P property. This lot was known as the place that truck drivers could "tarp" their loads, that is, cover it to protect it from the elements.

---

[1] Unless otherwise specified, all references to Mr. Waltman refer to Richard Waltman, the plaintiff.

Mr. Waltman began the process of tarping by putting the folded tarps on top of his load, and climbing on top of it using a ladder. It is undisputed that he owned all the tools necessary to tarp the load, including straps, the ladder, and the tarps themselves. It is not clear what caused him to do so, but Mr. Waltman fell from the top of the load to the ground, causing severe injuries. Specifically, both wrists were broken, and he sustained a head wound, including a fractured skull and lacerations, resulting in severe hemorrhaging.

It is not entirely clear what happened next. Mr. Waltman claims that a G-P employee helped him into the cab of his truck, but he has no memory of this. G-P claims that Mr. Waltman made his own way back to the cab. In any case, G-P employees noticed that the truck was still there some time later.[2] The tarp appeared to be unsecured. A G-P employee, Mr. Orton, went to check on Mr. Waltman and found him barely conscious (Mr. Waltman does not recall this) in the sleeper section of his truck cab. Mr. Orton returned to the main building, asked the clerical staff there to call an ambulance, and brought a trauma kit and additional assistance to the truck.

When the ambulance arrived, the EMTs secured Mr. Waltman to a backboard. Rather than remove him through the regular driver and passenger doors, the EMTs, with the help

_____

[2] In addition, there was testimony that another driver had noticed Mr. Waltman tarping his load, and on the way out, informed GP that it should check on Mr. Waltman after a while.

3

of approximately eight GP employees, removed Mr. Waltman through a smaller door that apparently went from the exterior of the truck right to the sleeper section of the cab. Mr. Waltman had lost a great deal of blood, and his survival was tenuous. He did survive, however, and filed this action on December 15, 2009. Further facts are discussed as needed for the analysis of the summary judgment issues.

## DISCUSSION

*Summary Judgment Law*

Summary judgment is appropriate where the movant has demonstrated that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1207-08 (10th Cir. 2010). As a general matter, the summary judgment movant has the burden to produce evidence supporting its claims. *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). If the movant does so, the burden of production shifts to the party opposing summary judgment to demonstrate that a genuine issue of material fact exists. *Id.* At all times, the Court must view the evidence in the light most favorable to the party opposing summary judgment. *Id.* at 1168. There is a genuine issue of material fact if a reasonable jury could find in favor of the non-moving party. *Id.* at 1169. In addition, the Court may only consider evidence that is admissible at trial—inadmissible evidence should be disregarded. *Johnson*, 594 F.3d at 1209.

*Duty to Provide Fall Protection*

G-P contends it owed no duty to Mr. Waltman. It argues that, as an independent contractor, he was responsible for his own safety. Mr. Waltman argues that G-P both controlled his work and assumed affirmative safety duties sufficient to impose a duty of reasonable care.

The parties do not contest the general law, but argue about the fine points of its application. They agree, for example, on the general rule that a property owner is not liable for injuries to a contractor's employees that are incident to the work to be performed. *E.g.*, *Jones v. Chevron USA, Inc.*, 718 P.2d 890, 894 (Wyo. 1986). The Wyoming Supreme Court has noted that this exception to the general duty of reasonable care "was developed to protect owners from suits by contractors who presumably assumed the risks associated with the work they undertook on the owner's premises." *Id.* at 895. The Supreme Court has rejected this rationale, however, noting that the contractor's employees do not have the same control as the contractor itself, and may not be able to avoid risks. *Id.* The court's rationale for the exception instead relies on the fact that the owner generally cedes control over the hazards of the work to the contractor and its employees.[3] *Id.*

---

[3] Under the facts of this case, the original rationale may be more appropriate. Mr. Waltman was essentially a subcontractor, not an employee of the contractor. He was free to refuse this or any job offered by R. Waltman Trucking if he was unprepared to take the

5

This basis in control leads to two situations in which a duty may arise. The two situations are when the employer exercises control over the work, and when the employer affirmatively assumes safety duties. *Id.* at 896. The difficulty lies in applying these exceptions to particular facts.

The Wyoming Supreme Court generally requires more than control over the premises in general or over a few incidents of work.

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work his own way.

*Restatement (Second) of Torts* § 414, cmt. c (1977), *quoted in, e.g., Ramsey v. Pacific Power and Light*, 792 P.2d 1385, 1386 (Wyo. 1990) and *Stockwell v. Parker Drilling Co.*, 733 P.2d 1029, 1033 (Wyo. 1987). The court has further explained that

---

risk.

> [t]he owner may retain a broad general power of supervision and control as to the results of the work so as to insure [sic] satisfactory performance of the independent contract—including the right to inspect, the right to stop the work, the right to make suggestions or recommendations as to the details of the work, the right to prescribe alterations or deviations in the work—without changing the relationship from that of owner and independent contractor or the duties arising from that relationship.

*Noonan v. Texaco, Inc.*, 713 P.2d 160, 165 (Wyo. 1986).[4]

As an initial matter, there is a threshold question of identifying the hazard at issue. The vacant lot itself is not a particular hazard—it is simply a plot of level ground. The only thing that makes the premises dangerous is the activity, tarping, that is being performed. Not incidentally, the activity is being performed by the truck drivers using their own equipment (or for other drivers, those of their employers—not G-P). The parties have not argued the obvious danger rule, probably because this danger, although not created by the defendant, was not entirely natural. But it is relevant that the hazard, which is the height of the truck off the ground, does not greatly involve G-P's actions. It is "incident to the work to be

---

[4] Note that this language suggests that liability depends on whether a contractor relationship exists. In *Jones*, the court suggested a kind of middle ground where a contractor remained a contractor, but the employer exercised sufficient control to subject it to liability. In later cases, such as *Franks v. Independent Production Co.*, the court appears to treat the question of liability synonymously with that of whether the contractor remains a contractor. 96 P.3d 484, 490 (Wyo. 2004).

performed" in the purest sense of the phrase.[5]

Mr. Waltman attempts to get around the contractor rule by claiming that GP exercised control in two ways. The first is that by failing to install fall protection, it prevented Mr. Waltman from performing the work the way he preferred, that is, with fall protection. Second, Mr. Waltman contends that the requirement that the load be tarped is sufficient control. The Court does not find either of these rationales to be sufficient to impose a duty of care on G-P.

There are some significant problems with Mr. Waltman's contention that G-P's failure to install fall protection constitutes control sufficient to impose a duty. Aside from the rather circular reasoning, G-P's action more closely resembles a failure to exercise control rather than an exercise of control. The conditions under which the work was to be performed were set at the beginning of this particular job. Mr. Waltman had picked up wallboard loads from the Lovell facility several times in the past. He was perfectly aware of the conditions awaiting him when he agreed to take this particular load. He testified that he had asked GP

---

[5] Plaintiff's counsel suggested at the dispositive motion hearing that tarping actually serves no useful purpose and does not benefit G-P. He noted that the carriers would be responsible for any loss due to weather. This is not a credible argument given that G-P may suffer more than just the loss of the physical wallboard. It could incur liability for failing to honor its contracts with those slated to receive the wallboard, and possible loss of good will if it becomes known that orders from G-P are unreliable.

8

about fall protection many years ago, and had been rebuffed. Yet he continued to accept loads. Put simply, this lack of fall protection was simply a condition under which he was required to work if he accepted the job, not an exercise of control over the manner in which the work was performed.

The requirement that the load be tarped also appears to be insufficient control to justify imposing a duty. Initially, it simply does not seem reasonable that this one act is sufficient to impose a duty any more than it is reasonable that G-P should be liable for vehicle collisions that occur during the course of the delivery itself. In either case, G-P gave general directions (deliver this load, tarped, to this location), and relied on the contractor to carry them out safely. It is well established that an employer retains the right to direct the general goals of the work of a general contractor. There is no indication that G-P had any influence whatsoever on the method or means of tarping; it required only that the load was tarped.

In *Franks*, the plaintiff argued that Mr. Andregg (who was an employee of another contractor, but the court assumed at times was an agent of the landowner) exercised control sufficient to impose liability. Mr. Andregg's control consisted of "order[ing] use of the backhoe to unload the [well] casing" that later injured the plaintiff. *Franks*, 96 P.3d at 491. The court, with little analysis, found that no liability was incurred as a result of this simple

9

direction. It does not appear that G-P's simple directive that all loads must be tarped amount to much more than Mr. Andregg's command.

Mr. Waltman also contends that G-P assumed affirmative safety duties. He primarily relies on the fact that G-P required certain safety practices in their building, and the fact that G-P participated in the OSHA Voluntary Protection Programs (VPP).

The Wyoming Supreme Court has addressed the question of affirmative assumption of safety duties a number of times. As the *Jones* court stated, "'if the employer retains only [the right to require that the contractor observe safety rules and practices] but assumes no affirmative duties and never directs the method of performance, there is insufficient control or supervision to render it liable.'" *Jones*, 718 P.2d at 896 (quoting *Mosolo v. State*, 644 P.2d 205, 211-12 (Alaska 1982) (alteration by *Jones* court)).

In *Ramsey v. Pac. Power and Light*, the plaintiffs pointed to the PP&L safety manager's statements

> that he had the responsibility to coordinate safety programs at the plant for PP & L employees ; that he would make contractors aware of special safety policies when they began work at the plant; and that if he observed a safety deficiency in connection with a contractor's work, he would notify one of the contractor's supervisors of it and see that the deficiency was corrected.

792 P.2d 1385, 1387 (Wyo. 1990). The Court did not engage in extensive discussion, but

10

determined that these facts "fall far short of" what is necessary to hold the property owner liable. *Id.* at 1388.

Considering its OSHA involvement, it is worth noting that the Supreme Court distinguishes between an employer or property owner stating that it is undertaking safety duties, and the actual exercise of those duties. In *Abraham v. Andrews Trucking Co.*, the defendant trucking company adopted an Amoco safety manual, which the plaintiff, the spouse of a deceased employee of a subcontractor, contended was an assumption of safety duties. 893 P.2d 1156, 1156 (Wyo. 1995). The court was not impressed by the adoption of the safety manual, reasoning that a relevant question was "[w]hether the duties were actually exercised . . . in the field." *Id.* at 1157. Noting that the defendant "never actually performed any safety duties in the field or elsewhere," the court held that it owed no legal duties to the plaintiff. *Id.* at 1157-58.

The current facts are somewhat more complicated, but these cases offer useful insight. There is some indication that G-P may have assumed some affirmative safety duties in a certain sense. Before his truck was loaded, Mr. Waltman was given a safety manual, which notified him that certain protective measures were required. These measures included physical equipment like hard hats and behavioral measures, such as keeping a certain distance away from forklifts to avoid getting run over. G-P personnel testified that they

11

enforced these rules, and on at least one occasion had ejected a contractor's employee for failing to follow the rules. Notably, the materials state that these rules apply anywhere on the premises with the exception of the employee parking lot and the administration building. This would seemingly include the tarping area.

The problem for Mr. Waltman is that this amounts to nothing more than "the right to require that the contractor observe safety rules and practices." *Jones*, 718 P.2d at 896. In isolation, it certainly appears that this behavior might meet the literal definition of "affirmatively assume safety duties." But these facts occur in legal context. Looking at *Ramsey*, it appears that G-P's treatment of contractors is similar to PP&L's behavior. The Wyoming Supreme Court determined that it was simply not enough in that case to impose a duty. Indeed, the case was apparently so clear-cut that the court did not feel the need to engage in extensive discussion. Even if the case at bar is weighted somewhat more in Mr. Waltman's favor, the facts simply "fall far short of" the sort of affirmative assumption of safety duties that may result in liability. *Ramsey*, 792 P.2d at 1388.

Mr. Waltman also points to G-P's membership in the OSHA VPP. According to the evidence presented on summary judgment, the VPP is a voluntary program by which an employer agrees to do more than required by the minimum OSHA rules. Mr. Waltman offered testimony to the effect that membership in the program required G-P to promise to

12

supply contractors and their employees with the same safety protection offered to its regular

employees. The problem with this argument is that there is no evidence that G-P ever actually

acted on those promises. At most, there is testimony that in very poor weather, GP would

sometimes permit the truck drivers to tarp inside the building, where fall protection was

available (otherwise exclusively to G-P employees). In the absence of some indication that

G-P actually acted to assume affirmative safety duties, there simply does not appear to be

evidence sufficient to justify imposing a duty on it.

Finally, Mr. Waltman suggests that OSHA regulations, as opposed to its VPP

participation, establish a duty of care to contractors. His argument, worth setting out at

length, is as follows:

> Beyond the VPP and its own policies, the OSHA regulations
> themselves establish duties to contractors, given
> Georgia-Pacific's control and assumption of duties as set forth
> above. The Wyoming Supreme Court has held "that an
> applicable statute or regulation may confirm a duty of care based
> upon the relevant common law governing employer/independent
> contractor relationships." *Franks v. Indep. Prod. Co.*, 96 P.3d
> 484, 494 (Wyo. 2004). Thus, where there is the required
> showing of control or an assumption of safety duties, the
> regulations can create a duty of care. *Id.*

Resp. to Mot. for Sum. Jmt., Doc. 77, at 20. *Franks*, however, does not have any relevance

to the question of whether a duty existed. The relevant discussion in *Franks* is the following:

13

> While we agree that an applicable statute or regulation may confirm a duty of care based upon the relevant common law governing employer/independent contractor relationships, it cannot impose a duty beyond it. Without a showing of pervasive control or an assumption of safety duties, the regulations do not create a duty of care.

*Franks*, 96 P.3d at 494.

The language in *Franks* is not entirely clear—the phrase "confirm a duty of care" is an unusual one. The court's discussion, however, suggests that the OSHA regulations are irrelevant to the question of duty, and instead tend to show the standard of care. In other words, the OSHA regulations are more properly addressed to the question of whether the defendant breached a duty than to the question of whether the defendant had a duty in the first place. Accordingly, the Court finds that the OSHA regulations did not create a duty.

In conclusion, the Court finds that there is no genuine issue of material fact on the issues of pervasive control or assumption of affirmative safety duties. The Court holds that G-P is entitled to judgment as a matter of law on Mr. Waltman's claim that G-P was negligent by failing to provide fall protection.

*Exacerbation of Mr. Waltman's Injuries*

Mr. Waltman also makes a claim for negligence based on an assertion that a GP

14

employee placed him in the cab of his truck after his injury, rather than sought medical attention. There is little direct evidence of how Mr. Waltman ended up in the cab of his truck. No GP employee testified about having any awareness of his fall or injuries before he was discovered in the cab. Mr. Waltman himself remembers only a "flash of yellow" before waking up in the hospital. During the fall, he apparently sustained a severe head wound and two broken wrists. When the EMTs arrived, Mr. Waltman was put on a back board, and apparently it took the assistance of eight people to get him out of the cab through a small door in the sleeper section.

Robert Waltman testified to receiving a telephone call from G-P. He stated that a female GP employee told him that his father was found by a forklift operator, who helped him back to the cab, but he was severely injured and would be going to the hospital. G-P has provided its phone records to demonstrate that G-P did not make this call. G-P's counsel argued during the hearing of this matter that this testimony is inadmissible hearsay, and must be disregarded. Mr. Waltman's counsel contended that summary judgment is not the place for making determinations of admissibility. Contrary to Mr. Waltman's position, however, the Court is mindful of its duty to consider only evidence admissible at trial. Based upon the information available to the Court at this time, it holds for the purpose of summary judgment that Robert Waltman's testimony of the statement from a G-P employee is inadmissible.

15

Robert Waltman's testimony aside, however, the Court holds that there is a genuine issue of material fact regarding the way that Mr. Waltman ended up in his truck after the fall. GP's main argument is that Mr. Waltman's theory that a G-P employee helped him into the truck is so implausible or speculative that no jury could believe it, and furthermore, that there is no evidence that any delay in seeking medical attention caused any damages to Mr. Waltman. Mr. Waltman argues that a jury could reasonably find in his favor, and moreover, that the jury needs no expert or particular additional evidence to conclude that a delay in medical attention "caused Mr. Waltman to suffer greater pain and suffering and loss of blood over the extended time period that help was not rendered to him." Resp. to Mot. for Sum. Jmt., Doc. 77, at 25.

Although not a strong claim, there exists a genuine issue of material fact. Considering the question of how Mr. Waltman ended up in the cab of his truck, there is no direct evidence at all, and nobody knows with certainty what happened. It appears that both parties' theories are plausible. The lack of a witness or any direct evidence, combined with the large number of people it took to get Mr. Waltman out of the truck (suggesting that one person was inadequate to get him into it in the first place), weigh in favor of G-P. On the other hand, Mr. Waltman points out that he had a major head wound, and with his wrists broken, it is not unreasonable to infer that he could not have opened the doors of the truck without assistance.

16

Notably, G-P's counsel at the hearing drew the Court's attention to one of Mr. Waltman's expert witnesses, whose testimony was to the effect that it is possible that a man in Mr. Waltman's condition could have gotten back into the cab of the truck, although the witness thought that an unlikely possibility. This testimony only highlights that Mr. Waltman's circumstances may have arisen as a result of either negligent assistance from another or through his own actions. In short, even disregarding Robert Waltman's testimony, there is a genuine issue of material fact about how Mr. Waltman ended up in the sleeper of his truck. That conflict is for a jury to resolve.[6] Similarly, the jury may reasonably infer based on the facts and common experience that any increased blood loss compromised Mr. Waltman's ability to recover from his injuries. There was considerable evidence that they were extremely severe, and that his survival was quite uncertain for some time. If nothing else, the jury could find that the blood loss increased the medical treatment necessary, and therefore caused harm. There are genuine issues of material fact regarding the exacerbation claim, and summary judgment should therefore be denied.

---

[6] At the hearing, G-P's counsel made the point that even if Mr. Waltman was helped into his truck, there's no indication of who helped him, *i.e.*, it could also have been another truck driver, rather than a G-P employee. This is a valid point, and the matter of who might have moved or helped to move Mr. Waltman is precipitously close to the grey area between an inference and speculation. Nevertheless, the Court holds that this is a matter best left to the jury.

*Partial Motion to Dismiss on Punitive Damages Issue*

G-P contends that there is no evidence from which a reasonable jury could find that it engaged in willful and wanton misconduct that would justify an award of punitive damages. For support, it relies on cases in which courts have discussed whether punitive damages were possible under particular facts. It points out, accurately, that courts do not permit punitive damages unless the plaintiff proves outrageous, reckless, willful, and wanton conduct. It then cites authority, some issued by this Court, illustrating that a company violating its safety regulations, even in a fairly egregious way, is not liable for punitive damages.

Mr. Waltman begins by pointing out, correctly, that punitive damages is not a separate claim, just a type of damages that may be available in certain circumstances. He contends that Federal Rule of Civil Procedure 56 permits only partial summary judgment on discrete claims, not on a component of damages. He further points to cases in which a reviewing court has reviewed for sufficiency of the evidence only after a trial, and suggests that this is the proper method of review.

As an initial matter, considering the Court's grant of summary judgment on Mr. Waltman's first claim, obviously punitive damages for that claim is no longer an issue. The question remains whether summary judgment is appropriate on the exacerbation claim. The

Court finds that the punitive damages issue survives on that claim. Assuming the jury finds that a G-P employee moved Mr. Waltman to the truck cab, it is not unreasonable that it might conclude—based on the blood and Mr. Waltman's injuries—that the employee's conduct rose to the level of willful and wanton disregard for his safety. This is a difficult matter to judge, of course, given that the Court cannot be entirely aware of the evidence that will be presented at trial. For that reason, the Court will deny the pending motion for partial summary judgment, and will determine after the evidence is closed whether the punitive damages issue should be submitted to the jury.

*Motion to Strike Affidavit of Manual Ypsilantes*

As part of Mr. Waltman's response to the motion for summary judgment, he included an affidavit from Mr. Ypsilantes, an expert safety consultant. The affidavit contains, among other things, conclusions that G-P affirmatively assumed the duty to protect contractors by its participation in the OSHA VPP. GP contends that this is inadmissible testimony of a legal conclusion, and further, that much of the affidavit and report are more appropriate for determining whether there was a breach, rather than the immediate question of whether a duty existed.

The Court need not address the question of whether to strike Mr. Ypsilantes's affidavit and other materials. In light of the Court's order granting summary judgment on the

19

issue of whether G-P had a duty, the contested materials are irrelevant. The Motion to Strike should be denied as moot.

## *CONCLUSION*

The Court finds that there is no genuine issue of material fact and Georgia-Pacific is entitled to judgment as a matter of law regarding whether it had a duty to provide fall protection to Mr. Waltman. The Court also finds that genuine issues of material fact exist regarding Mr. Waltman's claim that Georgia-Pacific, through its employees, exacerbated Mr. Waltman's injuries. The Court denies Georgia-Pacific's motion for partial summary judgment as it relates to the sole remaining claim. Finally, Georgia-Pacific's motion to strike is moot, and therefore denied.

Accordingly:

IT IS ORDERED that Defendant Georgia-Pacific's *Motion for Summary Judgment*, Doc. No. 65, is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that Defendant Georgia-Pacific's *Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages*, Doc. No. 73, is GRANTED IN PART AND DENIED IN PART.

IT IS FINALLY ORDERED that Defendant Georgia-Pacific's *Motion to Strike Affidavit of Manual Ypsilantes*, Doc. No. 86, is DENIED AS MOOT.

Dated this 14th day of October, 2010.

NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE